UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 MAR 23  PM 2: 12

CLERK

BY _____PM_____
DEPUTY CLERK

CORY WILSON,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )      Case No. 5:10-cv-185
                                      )
GLENRO, INC.,                         )
                                      )
            Defendant.                )

**OPINION AND ORDER GRANTING
DEFENDANT GLENRO, INC.'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 32)

This matter comes before the court on the motion for summary judgment filed by
Glenro, Inc. ("Glenro") (Doc. 32). Glenro seeks summary judgment on Plaintiff's claims
for strict liability, breach of warranty, and negligence. Each of these claims is based
upon Glenro's alleged failure to warn regarding a "Radround" it manufactured and sold
which was involved in an incident wherein Plaintiff Cory Wilson allegedly inhaled toxic
chemicals.

Oral argument was held on November 10, 2011. The parties completed their post-
hearing filings on December 7, 2011.

Plaintiff is represented by Susan J. Flynn, Esq. Glenro is represented by Jon T.
Alexander, Esq.

**I.    Undisputed Facts.**

From summer 2006 through spring 2008, Plaintiff was employed by Harbour
Industries, Inc. ("Harbour") at its Shelburne, Vermont plant. Harbour produces wire
insulated with polytetrafluoroethylene ("PTFE") for military and industrial use.
Throughout his employment at Harbour, Plaintiff worked as a PTFE Extrusion Line
operator. During Plaintiff's employment, Harbour's PTFE Extrusion Line incorporated
electric powered industrial infrared heaters produced and marketed by Glenro under the

tradename "Radround." Plaintiff claims he was injured on August 15, 2007 while performing a maintenance procedure on PTFE Extrusion Line No. 5 called "restringing."

### A.    The Radrounds.

Glenro designs, manufactures, and sells Radrounds for integration into various types of manufacturing and industrial systems. Because Radrounds are sold to sophisticated purchasers of industrial equipment for a wide variety of applications, Glenro does not provide instructions or advice in conjunction with its sale of Radrounds other than to affix a metal nameplate to each Radround that provides basic information regarding grounding and wiring requirements. Glenro advertises Radrounds for many uses, including to sinter fluoropolymer resins such as PTFE that have been previously applied to wire in an extruded paste form. Sintering involves heating powder just below its melting point until its particles soften and adhere to each other. This requires high temperatures close to the decomposition point. According to Plaintiff's expert, it is "common knowledge in the industry that flouropolymers decompose to dangerous chemicals when heated." (Doc. 53-2 at 6.)

Radrounds are designed, manufactured, and sold as a component for integration into various types of manufacturing systems, such as production lines, that require a heat processing function. The Radround, by itself, is neither intended to produce, nor capable of producing any finished product. For example, Radrounds have no means for setting, adjusting, or otherwise controlling their internal temperature. Instead, to have any functional capacity, the Radround must be connected to a separate external component known as a power/temperature controller. Without the ability to set, maintain, or adjust temperature through an external power/temperature controller, the Radround is incapable of performing any useful heat processing function for any known manufacturing application. The Radround also lacks any independent functionality because it cannot move a product, such as wire or tubing, through itself. Instead, conveyors, motorized drives, pulleys, brakes, and unwind and take-up spools, must be combined with the Radround to accomplish this function.

2

Glenro often sells individual Radrounds to customers who then design and assemble their own heat processing systems. A system typically consists of at least one Radround or similar product; a supporting structural steel framework that allows Radrounds to placed horizontally side-by-side or stacked vertically to form a heater tower; material handling mechanisms such as conveyors or pulleys to move the product through the Radround at an operator selected speed and line tension; a power/temperature controller to maintain constant operating temperatures; a material handling control module to set, monitor, and adjust operator selected line speeds and product tension; mechanisms for air input, ventilation, and exhaust; and cabinets that can be opened to access the product for purposes of re-threading or for cleaning and maintenance.

Harbour has never requested or received any assistance or advice from Glenro in designing, testing, engineering, installing, or assembling any aspect of its PTFE Extrusion Lines, which include multiple Radrounds. Glenro did not design a Radround or other product specifically to suit any of Harbour's materials or end products and never assisted Harbour in deciding which Glenro product might be most appropriate for any of Harbour's systems or processes. Harbour never discussed with Glenro any potential risks of PTFE decomposition, nor any other safety concern related to Harbour's planned use of Radrounds in its PTFE Extrusion Lines.

Although Glenro assumed from Harbour's public information that its intended use of the Radrounds was to sinter extruded PTFE onto wire, Harbour declined to confirm this assumption, other than to indicate that the Radrounds were for an unspecified extrusion operation. When ordering Radrounds from Glenro, Harbour specified only the quantity to be purchased and standard customer elections, such as length, internal diameter, wattage, and voltage.

## B.     Harbour's Use of the Radrounds and Restringing Procedures.

Since 1965, Harbour has been manufacturing PTFE-insulated wire. Since 2001, Harbour has periodically purchased Radrounds from Glenro. In 2005, Harbour purchased several Radrounds from Glenro for integration into Harbour's PTFE Extrusion Line No. 5, which Harbour designed and constructed in 2006 at the plant where Plaintiff

3

worked. Harbour viewed the Radround as a means of delivering heat to its wire and understood that the amount and duration of heat would be determined by its own settings for a separate power/temperature controller component. Here, Harbour connected stacked Radrounds to an extruder machine and a vaporizing console to create an integrated production line for manufacturing PTFE-insulated wire.

Wire broke at Harbour as often as once or twice per eight-hour shift. Prior to Plaintiff's alleged injury, Harbour's management knew that such breakages occurred. Plaintiff estimated that wire broke during his work shifts an average of three times a week. Wire can break for a number of reasons, including because of manufacturing defects in the wire itself, running the wire at too high a speed or with too much line tension, or if the wire catches or snags on something inside the PTFE Extrusion Line. Because PTFE will not decompose until it has been exposed to decomposition temperatures for a sufficient period of time, Harbour's process depended upon the PTFE extruded wire remaining in constant motion through the Radround towers at a speed Harbour deemed sufficient to avoid decomposition. Conversely, if a wire remains in a Radround without moving, it is exposed to greater heat and can burn and decompose.

During the relevant time period, when a wire broke in Harbour's PTFE Extrusion Line No. 5, it would either be pulled out of the Radround towers by a mechanized take-up spool or it would fall out on its own before the PTFE began to decompose. However, prior to August 15, 2007, both Harbour and Plaintiff were aware of instances in which broken wire remained stuck or hanging inside the Radround towers or topbox.

After a breakage, an operator must restring the wire. During restringing, the operator removes any broken PTFE-extruded wire from the vaporizing console (also called the pre-heater)[1] and replaces it with bare metal wire called "tag line" which is then tied to unbroken PTFE-extruded wire. After removing the wire from the vaporizing console, the operator then climbs upstairs to the third floor of Harbour's facility to an

---

[1] The vaporizing console is a component that pre-heats the PTFE-extruded wire before it enters the Radround towers so as to remove through vaporization a lubricant or plasticizer called Isopar previously added to the PTFE powder to form the PTFE extrusion paste. Glenro did not manufacture any part of the vaporizing console.

access cabinet called a "topbox" or "turnaround box." The operator opens the doors of the topbox, hangs another tag line over the pulley, and drops each weighted end of the tag line through the bottom of each adjoining heater tower. The operator then returns to the ground floor, ties the various tag lines together and to the finished product take-up spool, and restarts the material handling system that runs the wire through the PTFE Extrusion Line. During Harbour's restringing process, power to the Radrounds is not automatically shut off.

Prior to August 15, 2007, Harbour was aware that if a wire stopped inside the Radround towers, the PTFE would start to decompose. Other than maintenance and cleaning, Harbour was also aware that the only situation in which its operators would open the toxbox and expose themselves to the interior of the Radround towers would be to restring after a wire break. There was nothing in Harbour's design of its PTFE Extrusion Line No. 5 intended to mitigate the risks of PTFE decomposition in the event of a wire break. In addition, Harbour did not program its power/temperature controller to detect a wire break through a loss of line tension in order to produce an automatic shut off of the Radrounds.

After the incident involving Plaintiff, Harbour advised Vermont Occupational Safety and Health Administration ("VOSHA") that it would "incorporate a specific emphasis in the operator training manual to remove any and all insulated wire from the ovens prior to opening the 'topbox'" and would "add signage to all 'topboxes' warning for [the] potential for harmful fumes and the need to clear the ovens of all insulated wire before opening." (Doc. 79 at ¶ 120.) Harbour acknowledged that stationary PTFE-extruded wire would "raise operator safety concerns" as well as "present[] a potential hazard to all of our employees[.]" (Doc. 79 at ¶ 84.) Harbour advised VOSHA that Plaintiff's August 2007 incident "has highlighted a shortcoming in our operator training program." (Doc. 77 at ¶ 119.)

### C.   Plaintiff's Alleged Injury & Awareness of Risk.

At approximately 3:00 a.m. on August 15, 2007, Plaintiff, who was then 19, assisted one of his co-workers in addressing a broken wire in Harbour's PTFE Extrusion

5

Line No. 5. Plaintiff offered to restring the topbox of that Extrusion Line while his co-worker restrung the vaporizing console. Plaintiff testified that when he opened the topbox, he saw a pink or red substance resembling "cotton candy" floating in the air, which he assumed was some form of decomposed PTFE. However, he testified that he did not inhale any of this substance. Plaintiff nonetheless claims he inhaled toxic chemicals which he believes included Daiken-Polyflon PTFE which he alleges caused him to sustain a permanent lung injury. At the time of Plaintiff's alleged injury, other than the wire break, Harbour's PTFE Extrusion Line No. 5, including the Radrounds, appeared to be working as intended.

Although Harbour assumes that its line operators, including Plaintiff, receive on-the-job training in wire break procedures, Plaintiff denied receiving such training. Before his alleged injury, Plaintiff was aware that fumes could be generated inside the PTFE Extrusion Lines.

In summer or fall 2006, Plaintiff was restringing a PTFE Extrusion Line after a wire break and opened an access door to the pre-oven vaporizer console, and inhaled what he believed to be a blast of hot, dense air. For one to two hours thereafter, Plaintiff experienced coughing, shortness of breath, a runny nose, irritated mucus membranes, and irritated "hot" lungs. Following this incident, Plaintiff knew there was some danger or risk in opening the vaporizing console to restring after a wire break. As a result, when Plaintiff restrung the vaporizing console, he stood farther back and to the side of the access door. Plaintiff does not associate this incident with any potential danger in restringing the topbox after a wire break although he concedes that he was aware that hot air could also rush out of the topbox when opened. Plaintiff admits he took no precautions in restringing the topbox on August 15, 2007.

Plaintiff concedes that the Radrounds involved in this incident were not themselves defective.

## D.   Glenro's Knowledge of Potential for Injury from PTFE Sintering.

Prior to August 15, 2007, Glenro had no knowledge or notice of any persons alleging that they had inhaled fluoropolymer particles or the decomposition products of

6

fluoropolymers such as PTFE, as the result of a sintering operation. Glenro also had no prior knowledge or notice of any persons alleging that one of Glenro's products had played a role in causing or contributing to an alleged injury or health condition. Glenro, however, had performed experiments with PTFE sintering for a customer and had Material Safety Data Sheets for PTFE which discuss the potential dangers of heating PTFE above certain temperatures under certain conditions.

  **E. Expert Opinions.**

  Glenro's expert on PTFE processing, Dr. Sina Ebnesajjad, has never seen a warning label on a heater or oven used for sintering. He opined that the typical maximum processing temperature for PTFE, which should not be exceeded, is approximately 752 degrees Fahrenheit. He further noted that the operating temperatures selected by Harbour for the Radrounds in PTFE Extrusion Line No. 5 were as high as 1,000 degrees Fahrenheit. Dr. Ebnesajjad characterized this temperature as "very, very hot" and opined that Harbour's temperatures were "set up very high in [his] view" for sintering PTFE. (Doc. 79 at ¶ 76.) Dr. Ebnesajjad further opined that, given the extent to which Harbour selected operating temperatures above the 752 degree typical maximum processing termperature for PTFE, there was no evidence that Harbour made any effort to adhere to the principle of "Optimization," that is, to reduce the temperature to what is actually required to achieve the sintering operation. Prior to Plaintiff's alleged injury, Dr. Ebnesajjad had never heard of broken wire getting caught in the topbox of a PTFE Extrusion Line.

  Although Plaintiff's engineering expert, Dr. Arie Hochberg, conceded that the Radrounds were not dangerous at the time they left Glenro's control, he opined that Glenro should have affixed plaques to its Radrounds with warnings of "Dangerous fumes" and "Dangerous decomposition products." Dr. Hochberg opined that Glenro could easily foresee the dangers of heating PTFE and these warnings would have minimized the harm posed to anyone working on or around the Radrounds. Dr. Hochberg acknowledged that these suggested warnings would not be applicable to the heat-processing of materials other than PTFE and fluoropolymers. He volunteered that

7

his belief that the Radround was "made specifically for PTFE" was just "speculat[ion]." (Doc. 79 at ¶ 7.)

Dr. Hochberg opined that PTFE is usually sintered with the heaters operating just below the decomposition temperature, and that Harbour would have determined the operating temperatures for the Radrounds within PTFE Extrusion Line No. 5 as part of its goal of making more PTFE insulated wire in a shorter amount of time. If Harbour had chosen a slower line speed, it could have used lower operating temperatures. He acknowledges that he has no information that suggests that Glenro knew anything about how the Harbour PTFE extrusion line was designed or constructed other than the fact that Radrounds might be part of it. In addition, he acknowledged that Glenro had no knowledge of Harbour's operating temperatures, line speeds, or other settings for processing PTFE. Dr. Hochberg opined that any danger associated with the Radround arises after it is integrated as a component into a larger production line and the existence of any danger depends on the materials being processed, the design of the production line, and the production processes or settings the customer chooses.

According to Dr. Hochberg, PTFE is heat-processed in industrial settings every day in factories throughout the world without posing any danger to anyone and can be extruded and sintered onto wire in a safe manner that does not create any hazard to the operators of PTFE-processing systems. He noted that even in the event of some PTFE decomposition and production of toxic fumes, a properly designed and functioning exhaust system would normally be expected to prevent any toxic exposure to workers. Indeed, he opined that "if PTFE is properly used, which has been the experience of the industry, [there] shouldn't be danger to health." (Doc. 79 at ¶ 66.)

Dr. Hochberg contends that the cause of and reason for the possible production of toxic fumes inside Harbour's PTFE Extrusion Line No. 5 on August 15, 2007 was PTFE-coated wire breaking and sticking inside the line. He does not have an opinion as to whether the Radrounds contributed to the wire breaking and sticking. In the absence of the wire breaking and sticking, the Radrounds' emission of heat posed no danger to Plaintiff. Dr. Hochberg concedes that because Glenro did not know anything about

8

Harbour's PTFE-processing systems, methods, or conditions, the level or scope of any danger posed by Harbour's PTFE processing would not have been known to Glenro. His opinion concerning Glenro's ability to foresee a risk of harm is premised on his "assumption that Glenro knew the exact application to which the [Radrounds] . . . were going to be used by Harbour." (Doc. 79 at ¶ 113.) Because Harbour designed the PTFE Extrusion Line No. 5, Dr. Hochberg opined that Harbour, rather than Glenro, had a duty to instruct its employees on specific ways to avoid exposure to PTFE fumes or decomposition products.

Dr. Hochberg is not an expert in sintering fluoropolymers like PTFE. He has never worked with, examined, or investigated the Radround, other than to review Glenro's website. The August 2007 incident involving Plaintiff is the first time Dr. Hochberg has heard an allegation that PTFE or other fluoropolymer fumes produced in a manufacturing setting harmed someone. Dr. Hochberg does not know whether any other manufacturer of industrial heating equipment had ever provided warnings concerning the risks of heat-processing PTFE.

## II.    Analysis and Conclusions of Law.

Glenro seeks summary judgment in its favor on Plaintiff's strict liability, breach of warranty, and negligence claims which constitute all claims brought by Plaintiff in this action. With regard to each claim, Glenro contends that under Vermont law, it had no duty to warn Plaintiff of any danger posed by its Radround. It further contends that it was entitled to rely on Harbour to warn Plaintiff of any risk of harm posed by Harbour's particular use of the Radround, and that, in any event, Plaintiff was aware of those risks. Finally, Glenro urges the court to conclude that, under the component parts doctrine, Glenro was not required to warn ultimate users of any danger that results from the manner in which Harbour chose to integrate the Radround into its PTFE Extrusion Line.

Plaintiff opposes the motion, asserting that there is a material issue of fact as to whether Glenro could foresee the dangers posed by its Radround which precludes summary judgment in Glenro's favor. Plaintiff also asks the court to find that since Glenro was aware of certain risks of an advertised use of the Radround both at the time of

9

sale and thereafter, it had a duty to warn of those risks. Finally, Plaintiff urges the court to reject the component parts doctrine and/or find it inapplicable in this case because the Radround, which it argues is the largest and most important part of Harbour's PTFE Extrusion Line, is not a "component."

A. **Standard of Review.**

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment the non-moving party must offer more than "mere speculation and conjecture[,]" *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

10

The court's jurisdiction over this case is based upon diversity of citizenship. Accordingly, the court analyzes Plaintiff's claims in accordance with Vermont law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

### B.   Plaintiffs' Claims Share the Same Analytical Framework.

Plaintiff's claims of strict liability, breach of warranty, and negligence each allege that Glenro's failure to provide adequate warnings for the Radrounds caused Plaintiff's injury. Consequently, liability for Plaintiff's failure to warn claims is governed by the same analytical framework.[2]

Under Vermont law, to establish a "failure to warn" claim, a "plaintiff must provide evidence from which a reasonable jury could find: (1) that defendant owed a duty to warn plaintiff; (2) lack of warning made the product unreasonably dangerous, hence defective; and (3) defendant's failure to warn was the proximate cause of plaintiff's injury." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). In order to withstand summary judgment, Plaintiff must proffer admissible evidence for each of the three elements. *Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 700 (D. Vt. 2010).

### C.   Whether Glenro Had a Duty to Warn.

The Vermont Supreme Court has recently reaffirmed that "[t]he existence of a duty is a question of law." *Lenoci v. Leonard*, 2011 VT 47 ¶ 9, 21 A.3d 694, 697. Plaintiff nonetheless contends that, in this case, summary judgment is unavailable because there exists a factual question as to whether Glenro could foresee the danger to Plaintiff. Under Vermont law, foreseeability is only one factor considered in determining a legal duty. *See Hamill v. Pawtucket Mut. Ins. Co.*, 2005 VT 133, ¶ 4, 179 Vt. 250, 892 A.2d 226, 228 ("Generally, whether there is a cognizable legal duty that supports a tort

---

[2] *See Adel v. Greensprings of Vermont, Inc.*, 363 F. Supp. 2d 692, 699 (D. Vt. 2005) ("Liability for breach of warranty . . . is congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965), which defines the strict liability of a seller for physical harm to a user or consumer of the seller's product.") (quotation omitted); *see also McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995) ("While strict liability and negligence are analytically distinct claims, they become one where liability rests on a failure to warn.").

action depends on a variety of public policy considerations and relevant factors, only one of which is foreseeability."); *see also McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) ("In tort cases, foreseeability is often confused with duty . . . .The mere fact that a consequence might foreseeably result from an action or condition does not serve to establish a duty owing from a defendant to a plaintiff.") (citation omitted).  Plaintiff is nonetheless correct that foreseeability is typically a question of fact, however, it is one that may be resolved as a matter of law where reasonable minds could not differ:

> In a claim premised on a failure to warn, liability is imposed only if the plaintiff pleads and proves that the defendant knew or should have known of the dangers posed by its product.  Typically, reasonable foreseeability, to a manufacturer, of the uses or misuses of its product, and of the risk for which there was not warning are questions of fact, as are issues of foreseeability generally.  The question of foreseeability of a danger may be resolved as a matter of law, however, where reasonable minds could not differ on the inability of the manufacturer to foresee the risk in question.

AM. L. PROD. LIAB. 3D § 34:4 (Feb. 2012) (footnotes omitted); *see also Hardingham v. United Counseling Service of Bennington County, Inc.*, 672 A.2d 480, 483 (Vt. 1995) (where an issue is "'generally a question for the jury,' the trial court may decide the question as a matter of law 'where the minds of reasonable persons cannot differ.'") (quoting *Rivard v. Roy*, 196 A.2d 497, 500 (Vt. 1963)).  Accordingly, if the undisputed facts mandate a conclusion that Glenro could not foresee the risk in question, the issue of foreseeability remains appropriate for summary judgment.

A manufacturer has a duty to warn "when it knows or has reason to know of dangers inherent in the product at the time the product is sold, or when the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer." *Needham v. Coordinated Apparel Group, Inc.*, 811 A.2d 124, 129 (Vt. 2002) (quoting *Webb v. Navistar Int'l Transp. Corp.*, 692 A.2d 343, 347 (Vt. 1996)).  For this reason,

> "[t]here will be no liability [under a failure to warn theory] without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn.  Moreover, there will be no liability unless [the] manufacturer failed

> to take the precautions that a reasonable person would take in presenting the product to the public."

*McCullock*, 61 F.3d at 1044 (quoting E. Page Keeton et al., PROSSER AND KEETON ON TORTS § 99 at 697 (5th ed. 1984)).

Plaintiff concedes that there were no dangers inherent in the Radround at the time of its sale. He must therefore establish that without warnings, the Radround, at the time of sale or thereafter, was dangerous to an extent beyond that which would be contemplated by an ordinary consumer.

Here, the ordinary consumer was a sophisticated purchaser of industrial equipment. Harbour, as a well-established purchaser and user of industrial equipment such as Radrounds, was an ordinary consumer. As Plaintiff's expert points out, it was common knowledge in the industry, of which Harbour was a member, that PTFE sintering had the potential to create toxic chemicals and release corrosive gases. Accordingly, even in the absence of warnings of "dangerous fumes" and "dangerous decomposition products," the ordinary consumer not only understood the nature and use of the Radrounds, but also understood the risks inherent in using the Radround for PTFE sintering. Against this backdrop, Plaintiff has failed to establish that, in the absence of warnings, the Radround was dangerous beyond the extent to which would be contemplated by an ordinary consumer. *See Guarascio v. Drake Assoc., Inc.*, 582 F. Supp. 2d 459, 465 (S.D.N.Y. 2008) (ruling that "a product seller is not liable for failing to warn regarding risks and risk-avoidance measures that should be obvious to, or known by, foreseeable product users" and concluding that "a manufacturer's duty to warn is limited where the user has certain knowledge or sophistication, professionally or otherwise, in regard to the product; there is no duty to warn members of a profession about the dangers generally known to that profession.") (citing RESTATEMENT (THIRD) OF TORTS § 2(c) (1998)).

The issue of whether Glenro could foresee either Harbour's use of the Radround or Plaintiff's alleged injury poses no additional obstacle to summary judgment in Glenro's favor. Glenro has never experienced an injury related to one of its products

previously and has never previously heard of a PTFE sintering related injury. Both experts had also never heard of such an injury. Plaintiff thus fails to proffer evidence that Glenro knew or should have known that the Radround had the potential to cause Plaintiff's particular injury. *See Lamontagne v. E.I. Du Pont De Nemours & Company, Inc.,* 41 F.3d 846, 859 (2d 1994) (under Connecticut law, "the seller's duty to warn encompasses only those dangers 'of which he knows, or should know'" and thus "there is no duty to warn of unknown or unforeseeable risks.") (citations omitted).

Moreover, nothing about the Radround, itself, posed any danger. To the contrary, because a Radround has no independent functionality, the ordinary consumer purchases it solely for its integration and use as part of a production line or other industrial function. As a result, any danger created arises solely out of the manner in which it is incorporated into a further use.[3] In this case, the duty to warn thus turns on what Glenro knew about Habour's use.

It is undisputed that Glenro knew only that Harbour's probable use of Radrounds was for PTFE sintering to create insulated wire. Glenro played no role in selecting the Radrounds for Harbour's use, advising as to their integration into Harbour's production line, or discussing with Harbour potential safety hazards. Plaintiff's expert concedes that Glenro could thus not foresee the specific manner in which Harbour would use the Radrounds. He further concedes that his opinion that Glenro had a duty to warn is based upon the "assumption that Glenro knew the exact application to which the [Radrounds]

---

[3] Glenro requests the court to predict that Vermont will adopt the component parts doctrine set forth in in the RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 5 (1998) which provides that a person or entity in the business of selling or distributing product components is subject to liability for a component sold and integrated into another product that harms persons or property if "the component is defective in itself and the defect causes the harm" or "if the seller or distributor of the component substantially participates in the integration of the component into the design of the product" and "the integration of the component causes the product to be defective," which defect causes the harm. Plaintiff urges the court not to adopt the component parts doctrine and argues that the Radround was not a "component" as it is the largest and most significant part of Harbour's PTFE sintering process. The court need not decide this question of first impression because Glenro's liability may be decided as a matter of law even in the absence of the component parts doctrine.

. . . were going to be used by Harbour." (Doc. 79 at ¶ 113.) Because these assumed facts are inaccurate, Plaintiff lacks an expert opinion that Glenro had a duty to warn in the circumstances of this case.

For the foregoing reasons, based upon the undisputed facts in this case, reasonable minds could not differ that the Radround was not unreasonably dangerous when it left Glenro's control and did not become so thereafter as a result of any action or inaction by Glenro. Reasonable minds could also not differ in concluding that Glenro could not foresee Harbour's particular use of the Radrounds in its PTFE Extrusion Line No. 5, nor the potential for Plaintiff's alleged injury. Finally, reasonable minds could not differ in concluding that Glenro did not fail to take the precautions a reasonable person would take in presenting the Radround to the public. Glenro thus had no duty to warn either Harbour or Plaintiff. As a result, Glenro is entitled to summary judgment on each claim set forth in Plaintiff's Complaint.

### D. Other Elements of Plaintiff's Failure to Warn Claims.

Because the court has determined that, as a matter of law, Glenro had no duty to warn, the court proceeds no further in determining whether Plaintiff has proffered admissible evidence in support of the remaining elements of its duty to warn claims. In doing so, it notes that the parties' briefing on these issues was cursory as was their oral argument.[4]

### III.    Conclusion.

For the reasons stated above, the court hereby GRANTS Glenro's motion for summary judgment (Doc. 32).

---

[4] *See Ibarra v. City of Chicago*, 2011 WL 4583785, at *8 (N.D.Ill. Sept. 28, 2011) ("Given the complexity of the legal issues, the parties' cursory treatment of the issues, and the current stage of the litigation, the Court declines to dismiss Count II at this time."); *Allstate Ins. Co. v. Heil*, 2007 WL 4270355, at *2 n.2 (D. Haw. Dec. 6, 2007) ("Because the parties have not briefed the Rule 702 issue in anything more than a cursory way as part of their summary judgment arguments, the court declines to resolve the expert admissibility issues on the record before it."); *Jimmo v. Sebelius*, 2011 WL 5104355, at *21 n.13 (D. Vt. October 25, 2011) (declining to address additional arguments for and against dismissal based on issues minimally briefed by the parties and inadequately addressed at oral argument).

SO ORDERED.

    Dated at Rutland, in the District of Vermont, this 23rd day of March, 2012.

*/s/ Christina Reiss*

_____

Christina Reiss, Chief Judge
United States District Court

16